UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------X
                                        :

D3 INTERNATIONAL, INC.,                  :

                                    :

                       Plaintiff,        :            21-cv-06409 (LJL)

                                    :

            -v-                      :           OPINION AND ORDER

                                    :

AGGF COSMETIC GROUP S.P.A. and COMSETICA,    :
S.R.L.,                                    :

                                    :

                     Defendants.       :

                                    :

-----------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__3/7/2023__

LEWIS J. LIMAN, United States District Judge:

     Defendants AGGF Cosmetic Group S.p.A. ("AGGF")[1] and Cosmetica, S.r.l.

("Cosmetica," and collectively with AGGF, "Defendants") move, pursuant to Federal Rule of

Civil Procedure 56, for summary judgment: (1) dismissing the complaint of plaintiff D3

International Inc. ("D3" or "Plaintiff"); (2) granting Defendants' second counterclaim for

account stated; (3) finding Plaintiff liable for Defendants' fourth counterclaim for tortious

interference with contract and their fifth counterclaim for unfair competition;[2] and (4) awarding

---

[1] AGGF Cosmetic Group S.p.A. is now known as Diego Della Palma S.P.A.  *See* Dkt. No. 32 at 1.  For consistency with this Court's prior opinion and order, Dkt. No. 13, this opinion will continue to refer to AGGF Cosmetic Group S.p.A. as "AGGF."

[2] Defendants' notice of motion does not include a request for relief granting Defendants partial summary judgment on the fourth counterclaim for tortious interference with contract.  Pursuant to Local Rule 7.1 "all motions shall include . . . [a] notice of motion, or an order to show cause signed by the Court, which shall specify the applicable rules or statutes pursuant to which the motion is brought, and shall specify the relief sought by the motion."  Local Rule 7.1(a).  The Court overlooks the failure to include the relief on Defendants' fourth counterclaim because the memorandum of law and supporting documents provide notice and allow the Court to determine the motion on the merits rather than on procedural deficiencies.  *See Anora v. Oasis Professional Mgmt. Grp.*, 2023 WL 2307180, at *2 (S.D.N.Y. Mar. 1, 2023).

Defendants costs and fees.[3]  Dkt. No. 27.  For the following reasons, the motion for summary

judgment is granted in part and denied in part.

# BACKGROUND

The following facts are undisputed unless otherwise indicated.  They are taken from

Defendants' Rule 56.1 Statement and the materials submitted in connection with the motion.[4]

AGGF and Cosmetica are companies organized under the laws of Italy and located in

Milan, Italy and are engaged in the manufacture and sale of cosmetics.  Dkt. No. 32 ("Defs.

56.1") ¶ 1; Dkt. No. 30 ("D'Angelo Decl.") ¶ 3.  Their cosmetic products, now sold under the

"Diego dalla Palma" brand, are exclusively available in the United States through wholesale

distributors such as Plaintiff.  Defs. 56.1 ¶ 2; D'Angelo Decl. ¶ 4.

---

[3] While Defendants' notice of motion included a request for fees and costs, they do not mention
or provide a basis for that request in their briefing.  Defendants' motion for fees and costs is
denied.

[4] Plaintiff failed to submit a Rule 56.1 Statement and therefore is deemed not to dispute the facts
in Defendants' 56.1 Statement.  Local Rule 56.1 of the Southern District of New York requires
the non-moving party opposing the motion to "include a correspondingly numbered paragraph
responding to each numbered paragraph in the statement of the moving party, and if necessary,
additional paragraphs containing a separate, short and concise statement of additional material
facts as to which it is contended that there exists a genuine issue to be tried."  L.R. 56.1(b).
"Each numbered paragraph in the statement of material facts set forth in the statement required
to be served by the moving party will be deemed admitted for purposes of the motion unless
specifically controverted by a correspondingly numbered paragraph in the statement required
to be served by the opposing party."  L.R. 56.1(c).  While a district court can choose to review the
record "even where one of the parties has failed to file such a statement," the court "has broad
discretion to determine whether to overlook a party's failure to comply with local court rules"
such as Rule 56.1.  *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (S.D.N.Y. 2001).  A party
who fails "to respond to a Rule 56.1 statement in the proper form eschews its right to have the
Court search the record to determine whether the allegedly undisputed fact is in fact disputed."
*Keawsri v. Ramen-Ya*, 2021 WL 3540671, at *3 (S.D.N.Y. 2021) (citing *Holtz,* 258 F.3d at 73).
Courts "have affirmed the grant of summary judgment on the basis of uncontested assertions in
the moving party's Local Rule 56.1 statement."  *Id*.  The facts in Defendants' Rule 56.1
Statement, when supported by citations to admissible evidence, are deemed undisputed for
purposes of Defendants' motion.

I.      **The Distribution Agreement**

AGGF and D3 were parties to a written agreement providing that D3 would serve as the exclusive distributor of AGGF's cosmetics products in the United States (the "Distribution Agreement") during the term of the agreement.  Defs. 56.1 ¶ 2; Dkt. No. 30-1 (Distribution Agreement); Dkt. No. 37 ¶ 2.  The Distribution Agreement required D3 to make escalating yearly minimum purchases of make-up and accessories from AGGF for subsequent sale in the United States.  Dkt. No. 30-1 at Pt. I ¶ D.  By its terms, the Distribution Agreement entered into force on January 1, 2010, and terminated at the end of December 31, 2012.  *Id.* at Pt. I ¶ A.

Among its terms, the Distribution Agreement obligated D3 to promote the products in exchange for D3 being given the right to act as the sole distributor of AGGF's products.  The Distribution Agreement did not commit D3 to any particular promotional activities—it left it up to D3 to determine how to best promote the products in the U.S. market.  Defs. 56.1 ¶ 23.  The Distribution Agreement required D3 to "promote the sale of [the products] in the most effective manner, guaranteeing to form and maintain an organization sufficient to achieve the [Distribution Agreement's] objectives." Dkt. No. 30-1 at Pt. II ¶ 1.2.  Such activities included "advertising, sales promotion and demonstration activities . . . corresponding reasonably to [ ] market demands."  *Id*. at Pt. II ¶ 1.3.

Under the Distribution Agreement, any costs for those advertising and promotional activities were to be at D3's expense.  Defs. 56.1 ¶ 22.  The Distribution Agreement mentioned D3's payment obligation several times.  It stated that "[D3] shall, at its own expense, perform all necessary advertising."  Dkt. No. 30-1 at Pt. II ¶ 1.3.  It also stated that:

> It is in any case intended that [D3] shall be responsible for all advertising necessary to promote the PRODUCTS within the Territory.  Unless otherwise specified, all of the costs of advertising (shows, exhibitions, events, P.R. events, and other) and of training, education, seminars are to be entirely covered by [D3].

*Id.*; *see also* Defs. 56.1 ¶ 22.  These advertising and promotional activities were built into the

price structure of the agreement.  D3 agreed not to spend less on those activities than the

percentage allocated for those activities indicated in the Distribution Agreement's attached price

structure.  Dkt. No. 30-1 at Pt. II ¶ 1.3; *id*. at Attach. B; Defs. 56.1 ¶ 22.  AGGF approved the

advertising program and would provide necessary "advertising supports" for the purpose of

allowing D3 to carry out agreed advertising and promotional activities.  Dkt. No. 30-1 at Pt. II

¶ 1.3; Defs. 56.1 ¶ 24.  In exchange, AGGF agreed to refrain from appointing any other

distributors, sales agents, or intermediaries for product sales in the United States.  Dkt. No. 30-1

at Pt. II ¶ 1.

> The Distribution Agreement provided the following with respect to duration:

PART I

A.  DURATION

This Agreement shall enter into force on January 1st 2010 and will expire at the end
of December 31st 2012.  Six months before the expiry date of the contract, the
Parties have to confirm its renewal by written notice.  In case of renewal, the Parties
will have to negotiate the new minimum yearly purchases of Products, updating the
commitment indicated in Article D.  Without prejudice to the obligation to execute
in writing any renewal of the Agreement, it is in any case intended that the
minimum purchases to be agreed, as the case may be, for the first year of the second
period cannot be less than a 10% increase with respect the last year of the first
period.

Dkt. No. 30-1 at Pt. I ¶ A.  The Agreement could be terminated earlier than December 31, 2012,

but only by written notice to the other party and under specified circumstances, such as the other

party's uncured failure to fulfill or delay the fulfillment of a contractual obligation, or in the

event of insolvency or bankruptcy.  *Id.* at Pt. II ¶ XIII (Termination).

> At no point during their relationships with D3 did AGGF or Cosmetica agree to pay D3's

promotional expenses.  Defs. 56.1 ¶ 24; D'Angelo Decl. ¶¶ 16–17.  Defendants also never

otherwise agreed to pay D3 in the event of a termination.  Defs. 56.1 ¶ 21; D'Angelo Decl. ¶ 14.

4

## II.      The Termination of the Distribution Agreement and Subsequent Events

There is conflicting evidence in the record as to how the Distribution Agreement came to an end.  D'Angelo Decl. ¶ 6.  Defendants state that the Agreement expired by its terms on December 31, 2012.  Defs 56.1 ¶ 5.  Plaintiff contends that the parties cancelled the contract at some point at or before its expiration date of December 31, 2012, because D3 "didn't make [its] numbers," Dkt. No. 29-4 at 13–15, 46; Defs. 56.1 ¶ 6, but it identifies no written notice that would have effected a termination.[5]

In any event, despite the fact that the Agreement expired by its terms no later than December 31, 2012, the parties continued to perform into 2013.  Defs 56.1 ¶ 5.  D3 continued to buy products from Defendants and sell those products in the United States following the termination of the Distribution Agreement.

The parties dispute the terms under which they continued to do business after December 31, 2012.  D3 contends that the parties formed an oral contract.  Mr. Natale Palazzolo, the President of D3, in his declaration, states that D3, AGGF, and Cosmetica:

> immediately entered into a subsequent oral contract in which the Defendants continued to grant the Plaintiff the right to be the exclusive distributor of Defendants' Diego dalla Palma cosmetic products in the United States for as long as the Defendants continued to export their Diego dalla Palma cosmetic products to the United States.

Dkt. No. 37 ¶ 2.  The terms of that oral agreement, however, were entirely indefinite.  Palazzolo testified that the "only thing" that D3 was told was that "they weren't looking for anyone else for

---

[5] Although Palazzolo testified that that he believed a letter was sent, *see* Dkt. No. 29-4 at 46, Plaintiff has produced no such letter before the Court and has no excuse for the failure to produce the letter, and thus reliance on that testimony would "contravene the best evidence rule, codified in Federal Rule of Evidence 1002." *Nicosia v. Amazon.com, Inc.*, 384 F. Supp. 3d 254, 268 (E.D.N.Y. 2019), *aff'd*, 815 F. App'x 612 (2d Cir. 2020); *E. Point Sys., Inc. v. Maxim*, 2016 WL 1118237, at *10 (D. Conn. Mar. 22, 2016) (striking testimony when contravening the best evidence rule).

the territory, and [they] can continue to sell and buy." Dkt. No. 29-4 at 16.   None of the terms

of the written agreement applied to the new oral agreement.  *Id*. at 35.  According to Palazzolo,

Plaintiff was "left to do what we wanted without any of the – the contractual things in the written

agreement."  *Id*. at 14–15.  Palazzolo further testified that D3 did not have any discussion with

AGGF about the terms that would govern the parties' relationship going forward.  *Id*. at 16.

There was never discussion or agreement about a commitment to a perpetual contract or the

longevity of the contract.  *Id.* at 17.  Palazzolo testified that "there was no discussion . . . of

anything else."  *Id*.; Defs. 56.1 ¶ 7.

In any event, on January 1, 2016, AGGF assigned the rights it had under the Distribution

Agreement to Cosmetica.  Defs. 56.1 ¶ 8; Dkt. No. 30-2.  D3 accepted Defendants' notice that

Cosmetica was AGGF's assignee, and from January 1, 2016, onward, Cosmetica exclusively

performed the contractual obligations that AGGF had previously performed.  Defs. 56.1 ¶ 10;

D'Angelo Decl. ¶ 7; Dkt. No. 29-4 at 26–27.  Thereafter, Cosmetica provided the products to D3

for sale and exclusively carried out AGGF's obligations under the Distribution Agreement.

Defs. 56.1 ¶ 9; D'Angelo Decl. ¶ 7.  AGGF had no further involvement.  Defs. 56.1 ¶ 9.

## III.     Termination of the Relationship and Subsequent Events

In early 2020, Cosmetica and D3 had discussions about possible revision or termination

of their relationship.  *Id.* ¶ 11.  Cosmetica was disappointed with D3's sales performance; D3 had

not placed any new orders for 2020.  *Id*.; D'Angelo Decl. ¶ 8.  D3's sales had been €31,252.05 in

2019 and €34,131.75 in 2018.  Defs. 56.1 ¶ 12; D'Angelo Decl. ¶ 8.  D3 also had not paid

Cosmetica for products Cosmetica had supplied for U.S. distribution in 2019.  Defs. 56.1 ¶ 13;

Dkt. Nos. 30-4, 30-5.  D3, as part of these discussions, told Cosmetica that "[w]e understand that

[Cosmetica] has the right to choose a new distributor and to change strategic directions for the

market."  Defs. 56.1 ¶ 14; Dkt. No. 30-3 (January 23, 2020, email from Palazzolo).

On or about July 15, 2020, Cosmetica advised D3 that it was unwilling to continue with D3 as its exclusive distributor because of its dissatisfaction with D3's performance.  Defs. 56.1 ¶ 15; D'Angelo Decl. ¶ 10.  Cosmetica offered to continue the relationship on different terms, with D3 as a sub-distributor to another entity that Cosmetica planned to appoint as its new U.S. distributor.  Defs. 56.1 ¶ 15.  D3 declined to continue the relationship.  *Id.*  Cosmetica terminated the relationship with D3 with six months' notice, via letter dated July 9, 2020.  *Id.* ¶ 16; Dkt. No. 30-4.  That letter cited poor commercial results by D3 and also directed D3 to stop operating its Amazon.com ("Amazon") store for Cosmetica's products.  Defs. 56.1 ¶ 17; Dkt. No. 30-4.  Also, on or around July 2020, Cosmetica agreed with The PCA Group that it would be Cosmetica's exclusive U.S. distributor—a relationship that has continued to the present day.  Defs. 56.1 ¶ 20; D'Angelo Decl. ¶ 11.  At the end of the six-month notice period, in a letter dated December 31, 2020, Cosmetica formally advised D3 that the relationship between D3 and Cosmetica was terminated and D3 was no longer entitled to distribute Cosmetica's products.  Defs. 56.1 ¶ 18; Dkt. No. 30-5.  D3 did not respond or object to this letter.  Defs. 56.1 ¶ 18; D'Angelo Decl. ¶ 10.

Also of relevance following the termination of the Distribution Agreement were three remaining issues: D3's activities on Amazon following the termination, alleged trademark infringement, and unpaid invoices.

While D3 was acting as Cosmetica's distributor, D3 advised Amazon that it had the rights to sell Cosmetica's products in the United States and D3 was granted the rights to sell the products on Amazon.  Defs. 56.1 ¶ 26; D'Angelo Decl. ¶ 20.  Amazon offers online sales of various products, including cosmetics.  Defs. 56.1 ¶ 27; D'Angelo Decl. ¶ 21.  In connection with the termination of the parties' relationship, Cosmetica terminated D3's rights to sell its products online on Amazon and demanded that D3 give Cosmetica the credentials needed to

operate the Amazon store so that Cosmetica's new distributor, The PCA Group, would be able to operate the store.  D3 ignored this demand.  Defs. 56.1 ¶ 28; D'Angelo Decl. ¶ 22.  The PCA Group was able to resolve the problem with Amazon's cooperation despite D3's refusal to cooperate, but not until late 2021.  Defs. 56.1 ¶ 29; D'Angelo Decl. ¶ 23.  As a result, Cosmetica claims that it suffered the loss of sales that it would have been able to generate via the Amazon store.  Defs. 56.1 ¶ 30; D'Angelo Decl. ¶ 25.

AGGF also has registered European trademark rights in the mark Diego dalla Palma, which it licenses to Cosmetica.  Defs. 56.1 ¶ 31; D'Angelo Decl. ¶ 26.  Cosmetica, through AGGF, thus has trademark rights in the mark.  Defs. 56.1 ¶ 31; D'Angelo Decl. ¶ 26.

Finally, D3 did not remit the sum of €6,718.02 due pursuant to invoice no. 215003, dated October 25, 2019, and invoice no. 216648, dated November 28, 2019, both duly rendered by Cosmetica as payment for goods supplied by Cosmetica for sales by D3 to U.S. customers.  Defs. 56.1 ¶ 31; Dkt. No. 30-6 (invoices).

## PROCEDURAL HISTORY

Plaintiff initiated this action by filing a complaint on March 15, 2021, in the Supreme Court of New York, New York County.  Dkt. No. 1.  Defendants filed to remove this action to the United States District Court, Southern District of New York, based on diversity of citizenship under 28 U.S.C. § 1331 on July 28, 2021.  *Id*.  On August 5, 2021, Defendants filed a motion to dismiss or stay the action in favor of arbitration, or in the alternative, to dismiss the action based on the doctrine of forum non conveniens, with a declaration and a memorandum of law in support.  Dkt. Nos. 5–7.  Plaintiff filed an affirmation in opposition to the motion on September 9, 2021, Dkt. No. 8, and Defendants filed a reply memorandum of law and supporting declaration on September 17, 2021, Dkt. Nos. 9–10.  Plaintiff filed a further surreply affirmation in opposition on October 12, 2021.  Dkt. No. 12.  The Court granted the motion in part and

denied it in part, allowing for discovery on the alleged oral agreement.  Dkt. No. 13.  Defendants

filed an answer and counterclaims on February 28, 2022.  Dkt. No. 23.

Defendants filed this motion for summary judgment with supporting materials, including

their Rule 56.1 Statement, on May 6, 2022.  Dkt. Nos. 28–31.  Plaintiff filed an affidavit in

opposition on June 1, 2022, which did not include a Rule 56.1 Statement.  Dkt. Nos. 34, 37.

Defendants filed a reply memorandum in support on June 6, 2022.  Dkt. No. 38.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, a court "shall grant summary judgment if the

movant shows that there is no genuine dispute as to any material fact and the moving party is

entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "An issue of fact is 'material' for

these purposes if it 'might affect the outcome of the suit under the governing law,'" while "[a]n

issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for

the nonmoving party.'"  *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 97 (2d Cir. 2000)

(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  In determining whether

there are any genuine issues of material fact, the Court must view all facts "in the light most

favorable to the non-moving party," *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 69 (2d Cir.

2001), and the movant bears the burden of demonstrating that "no genuine issue of material fact

exists," *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002) (citations omitted).

If the movant meets its burden, "the nonmoving party must come forward with admissible

evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."

*Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).

"[A] party may not rely on mere speculation or conjecture as to the true nature of the

facts to overcome a motion for summary judgment."  *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir.

2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).  Nor may the non-

moving party "rely on conclusory allegations or unsubstantiated speculation." *F.D.I.C. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (quoting *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998)).  Rather, to survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  The non-moving party must also demonstrate more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986).  The non-moving party "cannot defeat the motion by relying on the allegations in [its] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (citation omitted).

## DISCUSSION

Plaintiff brings four claims: (1) breach of contract for failure to continue to use Plaintiff as the exclusive distributor of Defendants' products, leading to damages in both paid promotional expenses and lost revenue; (2) quantum meruit due to Plaintiff's expended promotional expenses and lost future revenues; (3) unjust enrichment due to Plaintiff's expended promotional expenses; and (4) breach of contract for failure to continue to use Plaintiff as the exclusive distributor of Defendants' products, leading to damages only in lost revenue.  Dkt. No. 1.  Defendants, in their answer, bring five counterclaims: (1) open book account for money due of €6,718.02; (2) account stated in the amount due of €6,718.02; (3) goods sold and delivered in the amount of €6,718.02; (4) tortious interference with contract based on preventing The PCA Group from taking over the Amazon store for 2021; and (5) unfair competition.  Dkt. No. 23.

Defendants move for summary judgment dismissing all of Plaintiff's claims; granting their account stated counterclaim; and finding Plaintiff liable for their tortious interference and unfair competition counterclaims.  Dkt. Nos. 28, 31.

10

For the following reasons, Defendants' motion for summary judgment is granted in part and denied in part.  The Court grants Defendants' motion for summary judgment denying all of Plaintiff's claims and in favor of Defendants' account stated counterclaim.  The Court denies summary judgment as to Plaintiff's liability for unfair competition and tortious interference.

## I.     Plaintiff's Breach of Contract Claim

Plaintiff alleges that Defendants have breached, in two respects, what it claims is an oral agreement reached after December 31, 2012, pursuant to which Defendants agreed to grant Plaintiff the right to be the exclusive distributor of Defendants' Diego dalla Palma products as long as Defendants continued to do business in the United States.  Dkt. No. 1 ¶ 4.  First, Defendants failed to reimburse Plaintiff for the promotion expenses Plaintiff incurred to build the Diego dalla Palma brand in the United States.  *Id.* ¶¶ 4, 12–14.  Second, Defendants breached a promise to continue to use Plaintiff as their exclusive distributor for as long as Defendants continued to export Diego dalla Palma products into the United States.  *Id.* ¶¶ 20–21.[6]

Defendants argue that they are entitled to summary judgment on both claims because no evidence exists from which a jury could find an enforceable agreement and, in the alternative, because the putative oral contract is barred by the statute of frauds.  Dkt. No. 31 at 8–11.  Defendants argue that, if the Court were to find an enforceable agreement based on the notion that the terms of the Distribution Agreement carried forward beyond its termination, the Court should apply the arbitration clause in that agreement and compel arbitration.  *Id.* at 12.  Plaintiff has not filed an opposition brief, instead only asserting in a declaration by Palazzolo, that

---

[6] The sole difference between the two claims is that the first claim seeks out paid promotional expenses and lost future revenue, Dkt. No. 1 ¶ 14, while the fourth breach of contract claim seeks only lost future revenue, *id.* ¶ 21.  This difference is immaterial to the Court's analysis because the Court concludes that there was no contract governing the parties' relationship past December 31, 2012.  Therefore, there is no theory of recovery for either paid promotional expenses or lost future revenue for breach of contract.

"Defendants, AGGF Cosmetic Group SpA. and Cosmetica, Sri., and Plaintiff, immediately entered into a subsequent oral contract [with] the Defendants."  Dkt. No. 34-2 ¶ 2.

The Court grants summary judgment dismissing the breach of contract claims because Plaintiff fails to demonstrate a genuine issue of fact as to the existence of a contract.

Under New York law "there are four elements to a breach of contract claim: (1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages."  *Wade Park Land Holdings, LLC v. Kalikow*, 589 F. Supp. 3d 335, 392 (S.D.N.Y. 2022) (internal quotation marks and citation omitted).  "The elements of contract formation are: (1) offer, (2) acceptance, (3) consideration, (4) mutual assent, and (5) mutual intent to be bound."  *OTG Brands, LLC v. Walgreen Co*., 2015 WL 1499559, at *6 (S.D.N.Y. Mar. 31, 2015) (citing *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 427 (2d Cir. 2004)).  "The fundamental basis of a valid, enforceable contract is a meeting of the minds of the parties, and, if there is no meeting of the minds on all essential terms, there is no contract."  *Benicorp Ins. Co. v. Nat'l Med. Health Card Sys., Inc*., 447 F. Supp. 2d 329, 337 (S.D.N.Y. 2006).  "The offer, acceptance, and manifestation of intent do not need to extend to every potential contract term — only the material terms."  *Geneva Lab'ys Ltd. v. Nike W. Afr. Imp. & Exp., Inc.*, 2022 WL 673257, at *5 (E.D.N.Y. Mar. 7, 2022).  "If an agreement is not reasonably certain in its material terms, there can be no legally enforceable contract."  *Caro Cap., LLC v. Koch*, 2021 WL 1595843, at *7 (S.D.N.Y. Apr. 23, 2021), *on reconsideration*, 2021 WL 2075481 (S.D.N.Y. May 24, 2021) (quoting *66 Mamaroneck Ave. Corp. v. 151 E. Post Rd. Corp.*, 575 N.E.2d 104, 106 (N.Y. 1991)).  Absent "content [as] to the nature and quantity of the alleged obligation . . . there is no basis for the Court to determine whether there was a meeting of the minds or that [a party] performed their obligations so as to be able to hold the [counterparty]

in breach." *Id.* "New York law requires that 'an agreement [be] reasonably certain in its material terms,' not just some of its material terms." *Id*. (quoting *Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp*., 548 N.E.2d 203, 206 (N.Y. 1989)).  "Whether there has been a meeting of the minds on all essential terms is a question of fact that must be resolved by analyzing the totality of the circumstances." *Benicorp Ins. Co.*, 447 F. Supp. 2d at 337.

Where a plaintiff alleges the existence of an oral agreement, it "faces a heavier burden": "To ensure that parties are not trapped into surprise contractual obligations that they never intended, more than agreement on each detail is required, there must be an overall agreement to enter into the binding contract." *Delaney v. Bank of Am. Corp*., 908 F. Supp. 2d 498, 514 (S.D.N.Y. 2012), *aff'd*, 766 F.3d 163 (2d Cir. 2014).  "Where an alleged contract is oral, plaintiff has a particularly heavy burden to establish objective signs of the parties' intent to be bound." *Oscar Productions, Inc. v. Zacharius*, 893 F. Supp. 250, 255 (S.D.N.Y. 1995) (citation omitted). As for the existence of an oral contract, this Circuit considers "(1) whether there has been an express reservation of the right not to be bound in the absence of a writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing." *Winston v. Mediafare Ent. Corp.*, 777 F.2d 78, 80 (2d Cir. 1985).

As a preliminary matter, it is first worth noting what Plaintiff does *not* argue.  Plaintiff does not argue that the Distribution Agreement continued in force after December 31, 2012.  As noted above, that Agreement required that any extension of the Agreement be in writing six months before expiration. Dkt. No. 30-1 at Pt. I ¶ A.  That did not occur.  Plaintiff also does not assert a breach of contract claim based on a theory of the existence of an implied-in-fact contract based on the terminated Distribution Agreement.  It expressly contends that none of the terms of

the Distribution Agreement continued into the period after December 31, 2012.[7]  Plaintiff rejects

any proposition that it had entered, by its conduct, into a new implied contract that "contained

the same provisions as the old," *Martin v. Campanaro*, 156 F.2d 127, 129 (2d Cir. 1946); *see*

*also Watts v. Columbia Artists Mgmt. Inc.*, 591 N.Y.S.2d 234, 236 (3rd Dep't 1992) (noting that

"a contract implied in fact" has "substantially the same terms and conditions as embodied in the

expired written contract").  Had the provisions of the Distribution Agreement carried forward

past December 31, 2012, as an implied contract, there would be no disputed issue of fact that

Defendants did not breach that contract because they either validly allowed the Agreement to

expire, or validly terminated such an implied agreement—six-month notice was provided.  *See*

Dkt. No. 30-4.  Instead, Plaintiff asserts a theory of breach based on a purported "subsequent oral

contract."  Dkt. No. 1 ¶¶ 3–4 (emphasis added).

    Plaintiff has not identified any facts that would permit a jury to find a genuine issue of

fact that there was a meeting of the minds on the essential terms of an oral contract.  It is

undisputed on this record that "the parties never discussed or agreed that Defendants committed

to a perpetual contract or about any other contract terms at the time the Distribution Agreement

---

[7] At any earlier stage in these proceedings, in opposition to the motion to compel compliance
with the arbitration provision in the Distribution Agreement, Plaintiff contended that the written
Distribution Agreement had terminated in 2012 and that its provisions therefore did not govern
the relationship between the parties.  *See* Dkt. No. 8 ¶ 2 ("This written agreement terminated
almost 9 years ago and the Plaintiff's complaint specifically states that upon the conclusion of
this written agreement on December 31, 2012 the Plaintiff and the Defendants entered into a
subsequent oral agreement and it is said subsequent oral agreement the Plaintiff is attempting to
enforce."); Dkt. No. 12 ¶ 12 ("In the instant case, Plaintiff . . . is not attempting to enforce *any*
terms under the expired written agreement[;] the Plaintiff is attempting to enforce terms under a
subsequent oral agreement"); *see also* Dkt. No. 12-1 (Affidavit from Palazzolo in opposition to
the motion to dismiss that "[t]here was an arbitration clause in the original written agreement but
I never agreed to arbitrate any disputes between my company and the Defendants in our
*subsequent oral agreement*" (emphasis added)).  Such admissions are cognizable on Defendants'
motion for summary judgment.  *See* Fed. R. Civ. P. 56(c)(1)(A), (c)(3) (affidavits and
declarations that are in record may be considered on summary judgment).

was no longer applicable," that "no new negotiations were conducted," and "no new terms were agreed upon" following the termination of the Distribution Agreement. Defs. 56.1 ¶¶ 6–7. Price, quantity, duration, and delivery terms were not discussed. Under these facts, no reasonable jury could conclude that there was an "objective meeting of the minds" on the material terms of any subsequent oral contract sufficient to show mutual assent. *Minelli Const. Co., Inc. v. Volmar Const., Inc.*, 917 N.Y.S.2d 687, 688 (2d Dep't 2011) ("Generally, courts look to the basic elements of the offer and the acceptance to determine whether there is an objective meeting of the minds."); *see In re Celsius Network LLC*, 647 B.R. 631, 648 (Bankr. S.D.N.Y. 2023) ("Traditionally, mutual assent was conceptualized as the culmination of a bargaining process, with an emphasis on both parties' intent to be bound following an active negotiation of terms."). This, alone, is sufficient to grant summary judgment on Plaintiff's breach of contract claims.

Nor would that record give rise to a genuine dispute of material fact even if the Court disregarded the absence of an opposing Rule 56.1 statement and searched the record. Plaintiff's only submission is a declaration from Palazzolo. The declaration is bereft of allegations of fact and where there are statements that could come close to being ones of fact, they are contradicted by Palazzolo's deposition. A party cannot defeat summary judgment by conclusory allegations in a declaration. *See Herod's Stone Design v. Mediterranean Shipping Company S.A.*, 434 F. Supp. 3d 142, 165 n.3 (S.D.N.Y. 2020) ("Conclusory allegations in a declaration are insufficient to create a question of fact for purposes of summary judgment when they are contradicted by any other evidence in the record."); *Sit-Up Ltd v. IAC/InterActiveCorp.*, 2008 WL 463884, at *22 n.9 (S.D.N.Y. 2008) (disregarding conclusory allegations in a declaration); *Serio v. Dwight Halvorson Ins. Servs., Inc.*, 2007 WL 9701070, at *6 (S.D.N.Y. 2007) ("[S]peculative and

conclusory allegations in Halvorson's Declaration relating to Platinum's knowledge of FSIM's alleged payments to Frontier during the second year of the Subscription Agreement fall short of the requirements of Rule 56 and cannot defeat Plaintiff's Motion for Summary Judgment."); *Fleming v. Verizon New York, Inc*., 2006 WL 2709766, at *7 (S.D.N.Y. 2006) (finding that a party cannot defeat a motion for summary judgment by offering conclusory allegations in a declaration and granting a motion to strike those portions of the declaration that were conclusory).  Moreover, under the "sham affidavit" rule, "in opposing summary judgment, a party who has testified to a given fact in his deposition cannot create a triable issue merely by submitting his affidavit denying the fact." *Palazzolo v. Corio*, 232 F.3d 38, 43 (2d. Cir. 2000); *see also Savarese v. City of New York*, 547 F. Supp. 3d 305, 328 (S.D.N.Y. 2021) (same).  "[I]f a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Perma Research & Dev. Co. v. Singer Co*., 410 F.2d 572, 578 (2d. Cir. 1969).

> Palazzo's declaration simply states that:
>
> Upon the conclusion of the [Distribution Contract] on December 31, 2012, the Defendants, AGGF Cosmetic Group SpA. and Cosmetica, Srl., and Plaintiff immediately entered into a subsequent oral contract in which the Defendants continued to grant the Plaintiff the right to be the Defendants' exclusive distributor of the Defendants' Diego dalla Palma cosmetic products in the United States for as long as the Defendants continued to export their Diego dalla Palma cosmetic products to the United States.

Dkt. No. 37 ¶ 2.  But the statement that the parties entered into an "oral contract" is a conclusion. Whether the undisputed conduct of the parties is sufficient to give rise to contractual obligation is a question of law.  *See Vacold LLC v. Cerami*, 545 F.3d 114, 123 (2d Cir. 2008); *Shann v. Dunk*, 84 F.3d 73, 77 (2d Cir. 1996).  Plaintiff's burden cannot be met by the mere assertion that the conduct was sufficient to give rise to contractual obligations without any statement of fact

regarding the nature of that conduct.  Palazzo's statement alone thus does not give rise to a genuine question of material fact.

Moreover, to the extent that the paragraph from Palazzolo could be read to suggest that there was an agreement between the parties that Plaintiff would have the right to be Defendant's distributor in perpetuity and "for as long as the Defendants continued to export their . . . products to the United States," Dkt. No. 37 ¶ 2, that statement is contradicted by Palazzolo's deposition testimony and is entitled to no weight.  Palazzolo testified that he did not "have *any* discussion with *anybody* from AGGF about *any* terms that would govern the parties' relationship going forward."  Dkt. No. 29-4 at 17 (emphasis added).  Palazzolo testified that "we were left to do what we wanted without any of the . . . contractual things in the written agreement."  *Id*. at 15 (emphasis added).  He further testified that it was *not* his "belief that after the termination or expiration of the written distribution agreements that any of its terms [would] continue to be applicable to and govern the relationship between the parties."  *Id*. at 33–35.  There was no "discussion about whether there was any finite term to the parties' relationship."  *Id*.  All issues such as "shipping issues, pricing issues, FDA issues," "and possibly others," were instead dealt with over time "in due course."  Dkt. No. 29-4 at 48–49.  There is thus no evidence that there was a meeting of the minds on any of the essential terms of a contractual relationship, much less on all of the terms that would be sufficient to give rise to contractual obligations.

There further is nothing in the record that would permit a reasonable jury to conclude that such a contract, even if it existed, would contain an exclusivity requirement, much less one that would continue in perpetuity and could not be cancelled by six months' notice.  Palazzolo did not identify anything Defendants said that could give rise to such a contractual obligation. Rather, he testified that the "only thing" Defendants told them was that "they weren't looking for

anyone else." *Id.* at 16–17.  He testified as to his own unilateral "implicit" "understanding" that Plaintiff would be permitted exclusivity because Defendants had stated that "they weren't looking for anyone else."  *Id.* at 19, 40.  He stated that while "there was no discussion of the terms" going forward, he did not think Defendants could have a second distributor because "it's just something no one does. . . .  You don't sell products into somebody's [sic] else's territory.  It's not done.  We wouldn't like it.  We wouldn't do it to somebody else."  *Id.* at 39.  But "[i]t is a basic principle of contract law that the unilateral understandings of one party, no matter how subjectively reasonable, are insufficient to form the basis of a contractual promise," *Suthers v. Amgen, Inc.*, 372 F. Supp. 2d 416, 424 (S.D.N.Y. 2005), and therefore Plaintiff's "implicit" subjective understanding of Defendants' singular statement is irrelevant to whether a binding obligation in a contract exists, *see Klos v. Polskie Linie Lotnicze*, 133 F.3d 164, 168 (2d Cir. 1997).  Even construing the facts in favor of the non-moving party, the lone statement from Defendants cannot give rise to a duty on the part of Defendants to continue to use Plaintiff as their exclusive distributor for as long as Plaintiff wanted going forward.  At best, the statement describes a current fact—that Defendants, at the time of the statement, were not looking for another distributor.  It does not contain a future promise.  It thus cannot bind Defendants to a "continuing contractual promise to grant the Plaintiff the right to be the exclusive distributor of the Defendants' Diego dalla Palma cosmetic products as long as the Defendants continued to do business in the United States."  Dkt. No. 37 ¶ 3; *see, e.g.*, *Moore v. Long Island Univ.*, 2022 WL 203988, at *5 (E.D.N.Y. Jan. 24, 2022) ("These are merely statements of fact . . . , not enforceable contractual promises.").[8]

---

[8] Plaintiff, in essence, admits in its sole testimony on the record that the exclusivity requirement was not the product of any negotiation or agreement, but was a product of its own interpretation drawn from the course of dealing of the parties and industry practice.  But "[w]hile industry

There is no genuine issue of material fact for which a jury might reasonably find for Plaintiff on its breach of contract claims. Accordingly, Defendants' motion for summary judgment to dismiss those claims is granted.[9]

## II.   Plaintiff's Quasi-Contract Claims: Quantum Meruit and Unjust Enrichment

Defendants move for summary judgment on Plaintiff's two claims for quantum meruit and unjust enrichment, which are premised on the theory that Defendants were unjustly enriched by receiving the benefit of Plaintiff spending $202,000 in promotional expenses and that the termination of the relationship caused Plaintiff to lose $122,000 per year in distribution business over four years. Defendants argue, *inter alia*, that AGGF, which ceased providing goods to Plaintiff as of 2015, was not enriched by Plaintiff's promotional activities and that Cosmetica was not otherwise enriched—Plaintiff was paid in full for the domestic sales it made through Plaintiff's promotional activities. Dkt. No. 31 at 15–16. Moreover, Defendants argue that Plaintiff was not unjustly enriched because Cosmetica always had the right to change the terms of its relationship with Plaintiff or abandon it and Plaintiff always had to bear its own promotional expenses over the course of the relationship. *Id.* at 16. The Court concludes that

---

custom and usage or a prior course of dealing between the parties is relevant to determining the meaning of a contract, it cannot create a contract where there has been no agreement between the parties." *Cherry River Music Co. v. Simitar Entertainment, Inc.*, 38 F. Supp. 2d 310, 319 (S.D.N.Y. 1999); *see also Ancile Inv. Co. v. Archer Daniels Midland Co.*, 784 F. Supp. 2d 296, 305 (S.D.N.Y. 2011) ("[A] prior course of dealing in and of itself is not a source of future contractual obligation.").

[9] For these reasons, the Court need not address whether the Statute of Frauds bars any putative agreement between the parties. The Statute of Frauds only applies to contracts that cannot be completed within one year. *See* N.Y. G.O.L. § 5-701. Here, there is no testimony or evidence as to the length or duration of the purported oral contract and whether performance could occur within that time. But if the purported agreement was indefinite, it is unclear how the agreement could be performed absent breach and subsequent termination. "If the only way to complete a contract within one year is to breach the contract, the contract does not satisfy the Statute of Frauds." *Milton Abeles, Inc. v. Farmers Pride, Inc.*, 2007 WL 2028069, at *3 (E.D.N.Y. July 11, 2007).

Plaintiff's claims attempt to secure through quasi-contract an entitlement which it never had, and would never have been able to obtain under contract—a right to be reimbursed in the future for the goodwill that Plaintiff generated through its promotional activities conducted on its own account in the present.

Plaintiff has not identified any facts that would give rise to a triable claim on such an extraordinary theory.  In New York, "unjust enrichment and quantum meruit claims rise and fall together," *Cambridge Cap. LLC v. Ruby Has LLC*, 565 F. Supp. 3d 420, 460 (S.D.N.Y. 2021), and both claims "are analyzed together as a single claim in quasi contract," *Gemma Power Systems, LLC v. Exelon West Medway II, LLC*, 2019 WL 3162088, at *4 (S.D.N.Y. July 1, 2019).  "[U]njust enrichment is a required element for an implied-in-law, or quasi contract, and quantum meruit, meaning 'as much as he deserves,' is one measure of liability for the breach of such a contract."  *Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 768 F. Supp. 89, 96 (S.D.N.Y. 1991), *rev'd on other grounds*, 959 F.2d 425 (2d Cir. 1992).  An unjust enrichment claim requires a showing that "(1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered."  *Int'l Techs. Mktg. v. Verint Sys.*, 157 F. Supp. 3d 352, 370 (S.D.N.Y. 2016).  A claim for quantum meruit requires a showing of "(1) the performance of services in good faith, (2) the acceptance of the services by the persons to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services."  *Id.*  "The mere expectation of compensation by a party is not sufficient to merit recovery.  Rather there must be a 'reasonable expectancy of receiving such compensation.'"  *Kreiss v. McCown De Leeuw & Co.*, 131 F. Supp. 2d 428, 437 (S.D.N.Y. 2001) (quoting *Argo Marine Systems, Inc. v. Camar Corp.*, 755 F.2d 1006, 1011 (2d Cir. 1985)).  "Both parties must understand that the party

performing the services has a reasonable expectation of compensation for those services." *Vioni v. Am. Cap. Strategies, Ltd.*, 508 F. App'x 1, 2 (2d Cir. 2013).

Up until December 31, 2012, the parties conducted business under the written Distribution Agreement.  Dkt. No. 30-1.  As already noted, that Agreement appointed Plaintiff as Defendants' exclusive distributor in the United States for a three-year period and required Plaintiff to purchase a minimum amount of products.  *Id.* at Pt. I ¶¶ A, C, D.  Plaintiff was required, at its own expense to engage in sales promotion and advertising activities in the United States.  *Id.* at Pt. II ¶¶ 1.2, 1.3.  AGGF was required solely to provide support for Plaintiff's advertising efforts as necessary to allow Plaintiff to carry out the agreed promotion and advertising activities.  *Id.* at Pt. II ¶ 1.3.  In exchange, Plaintiff was permitted a healthy markup on the products it purchased from Defendants and sold into the market.  *Id.* at Pt. II ¶ V, Attach. B.  In short, the Distribution Agreement did not commit D3 to any particular promotion activities, Defs. 56.1 ¶ 23, and the costs of such activities were included in the pricing of the products, *id*. ¶ 22, with Plaintiff earning money based off of the sales of those products, *id*. ¶¶ 12, 17.  After the Agreement expired, the parties continued to perform into 2013.  *Id*. ¶ 5.  Plaintiff continued to purchase products from Defendants and continued to sell those products for a profit. It alleges that during the seven-year time period from 2013 to 2019, its total gross receipts from the sale of Diego dalla Palma cosmetic products was $852,393 or approximately $122,000 per year.  Dkt. No. 1 ¶ 8.  Defendants never agreed to, or considered, paying for Plaintiff's promotional expenses under the Distribution Agreement or otherwise.  Defs. 56.1 ¶ 22.  Neither Defendant ever paid for Plaintiff's promotional or advertising expenses during their relationship. *Id*. ¶ 25.  Defendants also never agreed to pay Plaintiff in the event of termination under the terms of the Distribution Agreement or otherwise.  *Id*. ¶ 21.

In these circumstances, Plaintiff has not established either that Defendants were enriched or that any enrichment was unjust. As to AGGF, the contract was assigned on January 1, 2016, AGGF stopped providing goods to Plaintiff on that date, and AGGF thus was not enriched. *Id.* ¶ 8. As to Cosmetica, Plaintiff also cannot show that there was any unjust enrichment. Palazzolo's declaration states that "Plaintiff spent over . . . ($202,000) in promotional expenses to build the Defendants' Diego dalla Palma in the United States" and that "with each passing year, the Plaintiff increased its promotional expenses based on its confidence in the Defendants' continuing commitment to the Defendants' contractual agreement . . . and the Defendants' increasing commitment to distribute their Diego dalla Palma cosmetic products to the United States marketplace." Dkt. No. 34-2 ¶¶ 3–4. But even construing the facts in favor of Plaintiff, those expenses were incurred in the course of Plaintiff's activities in selling the products it purchased from Cosmetica into a market in which it, at the time, was the only distributor of Cosmetica's products. Plaintiff has offered no evidence that it was not compensated for those expenses in the form of the profits that it generated off of the sales. Plaintiff was obligated to market those products for this arrangement to have "business efficacy." *Wood v. Lucy, Lady Duff–Gordon*, 118 N.E. 214, 215 (N.Y. 1917) (citation and quotation mark omitted) (finding an implied promise to use reasonable efforts to market designs when there was an exclusive licensing and profit-sharing arrangement). There thus was no unjust enrichment. To the extent that there was some value generated for Cosmetica in the form of goodwill that lasted beyond the sales of the products, that is a necessary incidental effect of any licensing or distribution arrangement. If the distributor is successful, the manufacturer will benefit in the form both of sales and brand value going forward. But absent a statement that would have given rise to an expectation of compensation, the distributor is compensated in the form of the resale prices it is

permitted to charge. *See Leibowitz v. Cornell Univ.*, 584 F.3d 487, 509 (2d Cir. 2009) (affirming dismissal of quantum meruit claim because "plaintiff has offered no evidence that she expressed an expectation of compensation prior to the performance of the services or that anyone at the University indicated she would receive it"); *see also Cambridge Cap. LLC*, 565 F. Supp. 3d at 461 (dismissing unjust enrichment and quantum meruit claims because services were provided "in the hope that there would be a transaction and value would be returned" and there was no other expectation of compensation "even if a transaction did not close"). If it chooses to advertise to make sales, those advertising expenses are on its own account. Absent some form of agreement to the contrary, it is not entitled to any additional compensation or reimbursement for the benefit it incidentally provides the manufacturer through the good will that it generates. *See*, *e.g.*, *Tang v. Jinro Am., Inc.*, 2005 WL 2548267, at *8 (E.D.N.Y. Oct. 11, 2005) ("Plaintiff . . . continued his distribution and marketing efforts after the expiration of the agreements for his own benefit, and no rational trier of fact could find that Tang enriched Defendants' goodwill in the Jinro Soju distribution market at his own expense."); *Gidatex, S.r.L. v. Campaniello Imports, Ltd.*, 49 F. Supp. 2d 298, 305 (S.D.N.Y. 1999) (granting summary judgment dismissing unjust enrichment claim based on increase in goodwill because it s"is logically inconsistent: good business sense would indicate that [plaintiff] continued to support the mark because it continued to sell the furniture and because it wished to ensure that its customers would continue to purchase furniture at its stores. Any benefit to [defendant] was a by-product . . . ."); *Piccoli A/S v. Calvin Klein Jeanswear Co.*, 19 F. Supp. 2d 157, 167 (S.D.N.Y. 1998) (similar); *see also Hindsight Sols., LLC v. Citigroup Inc.*, 53 F. Supp. 3d 747, 776 (S.D.N.Y. 2014) (dismissing quantum meruit claim because "plaintiff already has received payment for this work and could not have reasonably expected to receive additional compensation above and beyond").

Plaintiff's claim to $122,000 per year after Cosmetica terminated the relationship between the parties is even further afield.  That claim is explicitly based on the premise that Defendants had a "contractual obligation to continue to use the Plaintiff as their exclusive distributor in the United States for as long as the Defendants continued to export their Diego dalla Palma cosmetic products to the United States."  Dkt. No. 1 ¶ 16.  In other words, Plaintiff's claim is based on the thinly veiled premise that, by inaction, Defendants created a contractual right in Plaintiff to continue to distribute Defendants' products in perpetuity.  But, as discussed above, that premise is faulty.  Plaintiff has identified no conduct engaged in by Defendants that could have given rise to an enforceable expectation that Plaintiff's rights to distribute Defendant's products—and to prevent Defendant from selling its products to others—lasted beyond the date upon which Defendants decided to cease selling their products to Plaintiff and decided it was more economic, and would enhance consumer welfare, to sell their products through other channels.  Palazzolo instead declares that "[b]ecause of the unexpected and sudden nature of the Defendants' breach, the Plaintiff was caught off guard and unprepared to fill the business void left," Dkt. No. 34-2 ¶ 10, and that it was "convinced that there would never be any future need to expand its supplier base due to its confidence in the Defendants' continuing commitment to their contractual agreement," *id*. ¶ 6; *see also id*. ¶ 5 (stating that "based on Defendants' contractual promises, the Plaintiff did not seek or solicit any additional cosmetic manufacturer suppliers but dedicated the majority of its time, effort and resources to satisfy the needs of the Defendants").  That failure, however, falls entirely on Plaintiff.  Plaintiff has identified no conduct engaged in by Defendants giving Plaintiff not only the right to sell Plaintiff's products but the right to sell those products going forward into the future.  In short, Plaintiff has no cognizable claim to the next four following years of business revenues; that was

a risk undertaken by Plaintiff in their arrangement.  There is no evidence in the record that would allow a reasonable jury to conclude that Plaintiff could have had an expectation of compensation for its projected business losses.

Thus, both claims fail.  Plaintiff did not enrich Defendants and there is no enrichment that is unjust.  Similarly, Plaintiff cannot show a reasonable expectation of compensation for its quantum meruit claim.

Plaintiff points to a letter that *Plaintiff* submitted to Cosmetica, *following* Defendants' notice to Plaintiff arguing that if Cosmetica intended to use another distributor, Defendants should buy Plaintiff out first.  *See* Dkt. No. 34-2 ¶¶ 11–13.  But that letter—which expresses a demand by Plaintiff—cannot at the same time create an expectation in Plaintiff.  It arose long *after* the provision of services, Plaintiff's lackluster performance, and Defendants' notice to Plaintiff that they intended to use a new distributor.  And it reflects a demand by Plaintiff and not an offer by Defendants.  Plaintiff plainly cannot manufacture claims of unjust enrichment or quantum meruit by a post-hoc letter asking for compensation.  *See Leibowitz*, 584 F.3d at 509; *see also Hindsight Sols.,* 53 F. Supp. 3d at 776 (dismissing quantum meruit claim because "plaintiff never requested a separate work order, never made a contemporaneous request for payment or even discussed compensation for the work at the time it was done").  If that were so, few unjust enrichment claims would ever be subject to dismissal.  A plaintiff confronted with even the most powerful evidentiary record that it provided services gratuitously could prevent summary judgment and force a jury trial by the simple expedient of sending a letter and stating that it should have received compensation for the past services voluntarily provided.  That is plainly not the law.

**III.     Defendants' Account Stated Counterclaim**

Defendants move for summary judgment on their account stated counterclaim.

Defendants allege Plaintiff is indebted to Defendant Cosmetica, S.r.l., for an account stated in the

amount of €6,718.02.  For the following reasons, the Court grants summary judgment in favor of

the account stated counterclaim.

"[A]n account stated refers to a promise by a debtor to pay a stated sum of money which

the parties had agreed upon as the amount due." *Lankler Siffert & Wohl, LLP v. Rossi*, 287 F.

Supp. 2d 398, 407 (S.D.N.Y. 2003).  Pleading an account stated claim requires showing "that:

(1) an account was presented; (2) it was accepted as correct; and (3) debtor promised to pay the

amount stated." *IMG Fragrance Brands, LLC v. Houbigant, Inc*., 679 F. Supp. 2d 395, 411

(S.D.N.Y. 2009).  "In the absence of a claim establishing underlying liability, the account stated

claim [is] not viable." *Air Atlanta Aero Eng'g Ltd. v. SP Aircraft Owner I, LLC*, 637 F. Supp. 2d

185, 197 (S.D.N.Y. 2009).  "It is incumbent upon a party in receipt of an account 'to examine the

statement and make all necessary objections' because 'an agreement to pay an indebtedness may

be implied if a party receiving a statement of account keeps it without objecting to it within a

reasonable amount of time unless fraud, mistake or other equitable considerations are shown.'"

*Lankler*, 287 F.Supp.2d at 407 (quoting *Kramer Levin Nessen, Kamin & Frankel v. Aronoff*, 638

F. Supp. 714, 719 (S.D.N.Y. 1986)); *see also Wistron Neweb Corp. v. Genesis Networks

Telecom Servs., LLC*, 2022 WL 17067984, at *16 (S.D.N.Y. Nov. 17, 2022); *Zim Am. Integrated

Shipping Servs. Co., LLC v. Sportswear Grp.*, *LLC*, 550 F. Supp. 3d 57, 67 (S.D.N.Y. 2021).

Defendants' Rule 56.1 Statement provides that Plaintiff failed and refused to remit the

sum of €6,718.02 due pursuant to invoice no. 215003, dated October 25, 2019, and invoice no.

216648, dated November 25, 2019, both duly rendered by Cosmetica for goods supplied by

Cosmetica for sales by D3 to U.S. customers.  The Rule 56.1 Statement also states that D3 has

actually acknowledged its debt pursuant to the invoices and promised to make payment, but has

failed and refused to make payment since.  Those facts are undisputed.  Those statements are

supported in the record by the declaration of D'Angelo, Dkt. No. 30 ¶ 32, and by Plaintiff's

answer to the counterclaims, which "admits indebtedness, in said amount" of the unpaid

invoices, Dk. No. 29-3 ¶¶ 8, 10, 11, but suggests that the amount of the unpaid invoices "should

be treated as an offset against the amount the Defendant owes the Plaintiff," Dkt. No. 29-3.[10]

That statement in Plaintiff's answer is binding upon Plaintiff in this action.  *See also Bellefonte*

*Re Ins. Co. v. Argonaut Ins. Co.*, 757 F.2d 523, 528 (2d. Cir. 1985) ("A party's assertion of fact

in a pleading is a judicial admission by which it normally is bound throughout the course of the

proceeding."); *Kessenich v. Raynor*, 120 F. Supp. 2d 242, 249 (E.D.N.Y. 2000) (finding that

party was bound by admissions regarding her indebtedness in her answer to a complaint).  It is

undisputed that an account was presented and accepted as correct.  Plaintiff's answer to

Defendants' counterclaims affirmatively indicates the validity of an agreement to pay an

indebtedness.

Palazzolo's only response is that he is "unaware of any outstanding unpaid invoices."

Dk. No. 37 ¶ 15.  But that statement contradicts Plaintiff's earlier statement in its answer to

Defendants' counterclaims and thus would not be enough to prevent summary judgment even if

the fact of Palazzolo's knowledge were material.  *See*, *e.g.*, *Clarke v. JPMorgan Chase Bank,*

---

[10] The answer was not filed by Plaintiff with the Court, although it was served by mail on Defendants on March 29, 2022.  Dkt. No. 29 ¶ 5.  That answer is cognizable before this Court. Defendants have also filed the answer and made it part of the Court record.  *See*, *e.g.*, *Chappo & Co. v. Int'l Equity Holdings, Inc.*, 2005 WL 2249784, at *1 n.1 (S.D.N.Y. Mar. 18, 2005) (addressing unfiled pleadings and motions papers that were served on opposing parties while also directing the parties to file the papers)  Although the answer was served late, the Court finds that the default was not willful and that setting aside the default would not prejudice Defendants.  *See Enron Oil Corp. v. Diakuhara*, 10 F.3d 90, 96 (2d Cir. 1993).

*N.A.*, 2010 WL 1379778, at *39 (S.D.N.Y. 2010) (declining to consider an assertion made in a declaration submitted in opposition to summary judgment that "flatly contradicts" what was alleged in the party's earlier pleading); *see also Bellefonte Re Ins. Co. v. Argonaut Ins. Co.*, 757 F.2d 523, 528–29 (2d Cir. 1985) (holding that district court, on summary judgment motion, had "properly disregarded [plaintiff's] affidavits seeking to controvert its own pleading"); *cf. Union Mut. Fire Ins. Co. v. Tejada*, 2023 WL 137758, at *15 (S.D.N.Y. Jan. 9, 2023) (describing how doctrine of judicial estoppel precludes a party from advancing a new position where, *inter alia*, "a party's later position is clearly inconsistent with its earlier position," and "the party asserting the two positions would derive an unfair advantage against the party seeking estoppel" (citation omitted)). However, the purported factual issue is not material. All that is necessary to make out a claim for account stated is that (1) an account was presented; (2) it was accepted as correct; and (3) the debtor promised to pay the amount stated. *See IMG Fragrance Brands, LLC*, 679 F. Supp. 2d at 411. It is irrelevant whether Palazzolo at the time of his declaration was aware of the account stated. There is no evidence to refute that the accounts were accepted as corrected and promised to be paid at the time they were presented. Accordingly, summary judgment is granted in favor of Cosmetica for an account stated in the amount of €6,718.02.

## IV.   Defendants' Counterclaim for Tortious Interference with Contract

Defendants move for partial summary judgment on their counterclaim asserting that Plaintiff is liable to Defendants for tortious interference with contract. Defendants allege that after the parties' relationship terminated, Plaintiff refused to relinquish control of the Amazon store and Defendants spent a year working with Amazon, without the help of Plaintiff, to fix the issue. Dkt. No. 23 at 5 ¶¶ 8–10. Defendants allege that this was an effort to intentionally interfere with Defendants' contract with The PCA Group, costing Defendants' an indeterminate

amount of lost sales.  *Id.* at 5 ¶ 10.  The Court denies summary judgment on liability for the tortious interference with contract counterclaim.

Under New York law, tortious interference with contract requires several elements: the existence of a valid contract between the plaintiff and a third party, defendant's knowledge of said contract, defendant's intentional procurement of the third-party's breach of the contract without justification, actual breach of the contract, and damages resulting from the breach.  *See Valley Lane Indus. Co. v. Victoria's Secret Direct Brand Mgmt., L.L.C.,* 455 Fed. App'x. 102, 104 (2d. Cir. 2012) (citing *Lama Holding Co. v. Smith Barney*, 668 N.E.2d 1370 (N.Y. 1996)); *see also Italverde Trading, Inc. v. Four Bills of Lading Numbered LRNNN 120950, LRNNN 122950, LRNN 123580, MSLNV 254064*, 485 F. Supp. 2d 187, 202 (E.D.N.Y. 2007) (noting that a demonstration of the breach, rather than mere interference, of the third party contract is necessary to sustain a tortious interference with contract claim under New York law).  "It is not enough to describe the contract in general terms, though; it is imperative that, in bringing a tortious interference claim, a plaintiff identify the relevant terms of the contract that existed that were breached by defendant."  *Alvarado v. Mount Pleasant Cottage Sch. Dist.*, 404 F. Supp. 3d 763, 791 (S.D.N.Y. 2019) (cleaned up).  Further, the plaintiff must show "the defendant's knowledge of the contract, including some knowledge of the terms and conditions of the allegedly interfered-with contract."  *Taboola, Inc. v. Ezoic Inc.*, 2020 WL 1900496, at *10 (S.D.N.Y. Apr. 17, 2020).

Defendants' Rule 56.1 Statement is insufficient to establish that Plaintiff is liable for tortious interference with contract.  Although the Statement indicates that Plaintiff refused to return the rights to the Amazon store, Defs. 56.1 ¶ 34, Defendants have not articulated sufficient facts regarding the agreement between The PCA Group and Defendants that was purportedly

breached, let alone whether Plaintiff had any knowledge of those terms and conditions. There are no statements pertaining to The PCA Group agreement's terms. *See*, *e.g.*, *A.V.E.L.A., Inc. v. Est. of Marilyn Monroe, LLC*, 364 F. Supp. 3d 291, 319 (S.D.N.Y. 2019) (dismissing on summary judgment when "[t]he AVELA Parties offer no evidence that there was any violation of the terms of a contract, and the time to produce such evidence has passed"); *FLB, LLC v. 5Linx*, 821 F. Supp. 2d 548, 562 (W.D.N.Y. 2011), *aff'd sub nom. FLB, LLC v. Cellco P'ship*, 536 F. App'x 132 (2d Cir. 2013) ("Plaintiffs have not produced evidentiary proof in admissible form that the terms of the Franchise Agreement were breached. Consequently, Jerabeck and 5Linx are entitled to summary judgment on the tortious interference with contract claims."). In fact, Defendant's 56.1 Statement provides that Defendants' relationship with The PCA Group "continues to the present day." Defs. 56.1 ¶ 20. Without showing breach of the contract, Defendants' motion for summary judgment with respect to liability for tortious interference with contract is denied.

## V.     Defendants' Counterclaim for Unfair Competition

Finally, Defendants move for partial summary judgment on Defendants' counterclaim that Plaintiff is liable for unfair competition under New York state law. The Court denies partial summary judgment for liability on the unfair competition counterclaim.

Defendants do not allege any unfair competition claim on the theory that the underlying products that Plaintiff sold through the Amazon website, following the termination of their relationship, had themselves infringed on Defendants' trademarks. Instead, Defendants rely on Plaintiff's use of Defendants' trademarks as a purported unauthorized distributor, alleging that Plaintiff "was not authorized to act or represent itself as Cosmetica's distributor or to use the Diego Dalla Palma trademarks and distinctive signs to distribute its Products." Dkt. No. 23 ¶ 5. Defendants' allegation is that "Plaintiff infringed Cosmetica's trademark rights by refusing to

relinquish the rights to the Amazon store despite Cosmetica's termination of its permission for Plaintiff to utilize its intellectual property." *Id*. ¶ 16.  Defendants assert that Plaintiff's refusal to relinquish control over the Amazon store was intentionally directed to deceive and mislead the public. *Id*. at ECF p. 8 ¶ 6.

Defendants' Rule 56.1 Statement with respect to this claim is relatively sparse.  It states that AGGF has registered European trademark rights in the mark Diego dalla Palma, which it licenses to Cosmetica.  Cosmetica, through AGGF, has U.S. common law trademark rights in the mark Diego dalla Palma.  Defs. 56.1 ¶ 31.  The Statement then provides that D3 refused to relinquish the rights to the Amazon store despite Cosmetica's termination of its permission for D3 to utilize its intellectual property.  *Id*. ¶ 32.  Both of these paragraphs in Defendants' Rule 56.1 Statement rely solely on D'Angelo's Declaration, which repeats both paragraphs verbatim. D'Angelo Decl. ¶¶ 26–27.

Most of the "elements of unfair competition under New York law closely parallel the elements of unfair competition under the Lanham Act." *Medisim Ltd. v. BestMed LLC*, 910 F. Supp. 2d 591, 606 (S.D.N.Y. 2012).  However, a claim for unfair competition under New York law also requires "some showing of bad faith." *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 35 (2d. Cir. 1995).  Therefore, Defendants "must prove: (1) actual confusion or a likelihood of confusion; and (2) the defendant's bad faith." *LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A*., 209 F. Supp. 3d 612, 678 (S.D.N.Y. 2016); *see also MiniFrame Ltd. v. Microsoft Corp.*, 2013 WL 1385704, at *8 (S.D.N.Y. Mar. 28, 2013) ("Under New York law, the gravamen of an unfair competition claim is the bad faith misappropriation of a competitor's commercial advantage."); *see also Jackpocket, Inc. v. Lottomatrix NY LLC*, 2022 WL 17733156, at *21 (S.D.N.Y. Dec. 7, 2022).

"As a general rule, trademark law does not reach the sale of genuine goods bearing a true mark even though the sale is not authorized by the mark owner." *Polymer Technology Corp. v. Mimran*, 975 F.2d 58, 61 (2d Cir. 1992). "While a trademark conveys an exclusive right to the use of a mark in commerce in the area reserved, that right generally does not prevent one who trades a branded product from accurately describing it by its brand name, so long as the trader does not create confusion by implying an affiliation with the owner of the product." *Dow Jones & Company, Inc. v. International Securities Exchange, Inc*., 451 F.3d 295, 308 (2d Cir. 2006). In that respect, a defendant may not use "plaintiff's trademarks in a manner which is likely to cause the public to believe that defendants are part of [plaintiff's] authorized sales network." *H.L. Hayden Co. of New York v. Siemens Med. Sys., Inc.*, 879 F.2d 1005, 1024 (2d Cir. 1989); *see also id*. (citing cases); 4 McCarthy on Trademarks and Unfair Competition § 25:43 (5th ed.) ("This right to resell a genuine branded item in an unchanged state carries with it the right to disclose and advertise that the dealer is selling those branded products.  But the advertising must not mislead customers into mistakenly believing that the dealer is an 'authorized distributor' or franchisee of the trademark owner.").

Defendants' Rule 56.1 Statement is insufficient to establish liability as a matter of law on their unfair competition counterclaim.  Again, there is no contention by Defendants that the goods sold by Plaintiff after the termination of the relationship were not, in fact, genuine goods from Defendants bearing a true mark.  The products were manufactured by Defendants and directly purchased by Plaintiff.  In support of their unauthorized dealership theory of liability for unfair competition, Defendants submit one lone paragraph asserting, in an entirely conclusory manner, that "D3 infringed Cosmetica's trademark rights by refusing to relinquish the rights to the Amazon store despite Cosmetica's termination of its permission for D3 to utilize its

intellectual property."  Dkt. No. 32 ¶ 32.  That vague paragraph only cites D'Angelo's declaration, which is repetitive and equally conclusory as to any infringement of trademark rights.  Defendants do not submit any facts describing the Amazon page at all.  There are no facts in Defendants' 56.1 Statement indicating whether and how Plaintiff advertised itself as an authorized dealer or any other affiliation with Defendants.  There are also no facts indicating how Plaintiff used Defendants' mark and whether the use of the mark would lead to the impression that it might lead to confuse consumers.  Furthermore, merely "[d]escribing the product nondeceptively and by name brand has never been a violation of a manufacturer's trademark."  *Golden Nugget, Inc. v. Am. Stock Exch., Inc.*, 828 F.2d 586, 591 (9th Cir. 1987).  In short, there are no facts provided that would compel a reasonable jury to find that Plaintiff has "done more than simply engage in the 'unauthorized sale of a trademarked article.'"  *Dan-Foam A/S v. Brand Named Beds, LLC*, 500 F. Supp. 2d 296, 326 (S.D.N.Y. 2007); *see also Polymer Tech. Corp. v. Mimran*, 975 F.2d 58, 63 (2d Cir. 1992), *as amended* (Nov. 25, 1992) ("[M]ore is required than unauthorized sales standing alone.").  The absence of facts on this record regarding any affiliation between Plaintiff and Defendants on the Amazon page precludes partial summary judgment finding liability on Defendants' unfair competition claim.

## CONCLUSION

The Court GRANTS summary judgment dismissing all of Plaintiff's claims and granting Defendants' counterclaim for account stated.  The Court DENIES partial summary judgment finding Plaintiff liable for tortious interference with contract and unfair competition.

The Clerk of Court is respectfully directed to close Dkt. No. 28.


SO ORDERED.


Dated: March 7, 2023
        New York, New York                              LEWIS J. LIMAN
                                                    United States District Judge